UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| Andrew Haig, MD, | |
| Plaintiff, | |
| v. | Civil Action No. 2:19–cv–179–kjd |
| Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health, | |
| Defendants. | |

## OPINION AND ORDER
(Doc. 50)

Plaintiff Andrew Haig, MD, brings this action against Defendants Dartmouth-Hitchcock Medical Center, Dartmouth-Hitchcock Clinic, Mary Hitchcock Memorial Hospital, and Dartmouth-Hitchcock Health (collectively, "Dartmouth") for breach of contract, promissory estoppel, and negligent misrepresentation. Dr. Haig asserts that Dartmouth extended him an offer of future employment and, after Dr. Haig's acceptance and detrimental reliance, reneged on that offer. (*See* Doc. 1 at 13–14.) For relief, Dr. Haig seeks payment of damages suffered including lost wages and loss of business income, payment of expenses incurred in preparing to start work at Dartmouth, cooperation from Dartmouth to repair Dr. Haig's reputation, and interest. (*Id.* at 15–16.)

Pending before the Court is Dartmouth's Motion for Summary Judgment (Doc. 50), which seeks dismissal of all claims. For the reasons explained below, Dartmouth's Motion is GRANTED with respect to the breach of contract claim and DENIED with respect to the promissory estoppel and negligent misrepresentation claims.

**Factual Background**

The following facts are principally drawn from the parties' Statements of Facts, and the documents referenced in the Statements of Facts.  (*See* Docs. 50-2, 55-1.)  The Court draws all factual inferences in favor of Dr. Haig, as the non-moving party, in accordance with the summary judgment standard.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (holding that on summary judgment "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

Dr. Haig has over twenty years of experience as a physician and is board certified in Physical Medicine and Rehabilitation (PM&R), a medical specialty that provides integrated, multidisciplinary care aimed at restoring function for disabled patients.[1]  (Doc. 55-1 at 1, ¶ 1.) He also has significant experience in Occupational Medicine, which focuses on the prevention and treatment of diseases and injuries occurring at work or in specific occupations.  (*Id.* at 2, ¶ 1a.)  In 2010, Dr. Haig sought employment as a PM&R physician at Dartmouth but was not offered the position.  (*Id.* ¶¶ 3–4.)  As part of his application for that position, Dr. Haig sent a letter to Dartmouth criticizing its deficiencies in the area of PM&R.  (*Id.* ¶ 5; *see* Doc. 50-4 at 3 ("I've become quite familiar with the long history of Dartmouth's failure to support [PM&R]"; "Dartmouth's structure strangles [PM&R] and thus harms itself.").)

In February 2017, Dr. Haig applied for a pain program director position at Dartmouth, again hoping Dartmouth was interested in building a PM&R program.  (Doc. 55-1 at 2, ¶ 8.) Dr. Haig was not offered the position.  (*Id.* at 3, ¶ 10.)

---

[1]  More specifically, PM&R, also known as physiatry, is "a medical specialty concerned with the prevention, diagnosis, treatment, and management of disabling diseases, disorders, and injuries typically of a musculoskeletal, cardiovascular, neuromuscular, or neurological nature by physical means (as by the use of electromyography, electrotherapy, therapeutic exercise, or pharmaceutical pain control)."  *Physical medicine and rehabilitation*, MERRIAM-WEBSTER MEDICAL DICTIONARY, https://c.merriam-webster.com/medlineplus/ physical medicine and rehabilitation (last visited Sept. 16, 2022).

Soon thereafter, Dr. Haig formed Haig Physical Medicine, PLC, where he began providing PM&R treatment to patients in Williston, Vermont starting in or around May 2017. (*Id.* ¶¶ 11–12.)  In December 2017, Dr. Haig formed Haig Consulting (*id.* ¶ 13), an entity designed to enter into contracts with hospitals, health care systems, and insurance companies located internationally and in New England to "build programs in pain and rehabilitation" (Doc. 50-32 at 7:10–14; *see* Doc. 55-2 at 5, ¶ 7).

In May 2018, Dr. Haig again sought a position at Dartmouth, this time with Dartmouth's Pain and Spine Center.  (Doc. 55-1 at 3, ¶ 15.)  He was not offered the position.  (*Id.*)

In late 2018, Dartmouth was searching for a new section chief for its Occupational and Environmental Medicine (OEM)[2] Section, a section within Dartmouth's Department of Medicine, because the current chief was set to retire at the end of that year.  (*Id.* at 5, ¶ 21.)  After the retirement and while the search for a new section chief was ongoing, the position was filled internally by Dr. Carolyn Murray on an interim basis until June 1, 2019.  (*Id.* ¶¶ 22, 22b.)  On October 11, 2018, Dr. Haig emailed Dr. Maria Padin, Dartmouth's Chief Medical Officer, to express his interest in the OEM section chief position.  (*Id.* ¶ 23.)  On the same date, Dr. Karen Huyck, a Dartmouth physician in the OEM section, contacted Dr. Richard Rothstein, Chief of Dartmouth's Department of Medicine and the person primarily responsible for hiring physicians within the Department, to suggest that Dr. Haig be considered for the OEM section chief position.  (*Id.* ¶ 24; *see id.* at 4, ¶¶ 16, 19.)  Although Dr. Rothstein was aware that Dr. Haig was

---

[2] OEM is "[t]he branch of medicine concerned with work-related diseases, hazards, and injuries; working conditions; employee rehabilitation; and the regulations that pertain to these issues."  *Occupational and environmental medicine*, THE FREE DICTIONARY, https://medical-dictionary.thefreedictionary.com/occupational+and+environmental+medicine (last visited Sept. 16, 2022).

a physiatrist[3] and not an OEM doctor, he decided to consider Dr. Haig for the OEM section chief position.  (*Id.* at 6, ¶ 26.)

On October 22, 2018, Dr. Rothstein spoke with Dr. Haig about the OEM section chief position, and the two discussed the possibility of eventually adding certain PM&R responsibilities to the position, given Dr. Haig's focus on PM&R rather than OEM.  (*Id.* at 7, ¶¶ 29–30.)  In mid-November 2018, Dr. Haig completed a first round of interviews at Dartmouth for the OEM section chief position.  (*Id.* at 8, ¶ 33.)  The interviews went well, other than some concerns that Dr. Haig did not have enough OEM experience.  (*Id.*)

On February 11, 2019, Dr. Haig interviewed at Dartmouth again, including with Dr. Edward Merrens, Dartmouth's Chief Clinical Officer, and Dr. Maria Padin, Dartmouth's Chief Medical Officer, each apparently forming a favorable impression of Dr. Haig.  (*Id.* at 12, ¶ 49.)  On the same date, Dr. Rothstein and Dr. Haig met for a second time; and Dr. Rothstein told Dr. Haig that he wanted him to be the next OEM section chief.  (*Id.* at 10, ¶ 43.)  In addition, according to Dr. Haig, Dr. Rothstein asked Dr. Haig "to move with all dispatch to apply for his New Hampshire medical license," which Dr. Haig did.[4]  (*Id.* at 14, ¶ 59a.)  Dr. Rothstein made clear to Dr. Haig, however, that there were several matters yet to be resolved, including how Dr. Haig's administrative, clinical, and academic time would be allocated and how conflicts of interest concerning Dr. Haig's clinical and consulting practices would be managed.  (*Id.* at 10, ¶ 43.)  According to Dartmouth, although Dr. Rothstein "was confident [at this time] that the deal eventually would get done," Dr. Haig's employment as OEM section chief would "not be a

---

[3] A physiatrist is "a physician who specializes in physical medicine and rehabilitation."  *Physiatrist*, MERRIAM-WEBSTER MEDICAL DICTIONARY, https://c.merriam-webster.com/medlineplus/physiatrist (last visited Sep. 16, 2022).

[4] Dr. Haig also claims he was asked to apply for hospital privileges at Dartmouth, which he did.  (*See* Doc. 55-2 at 9, ¶ 15.)

'done deal'" unless and until the above matters, along with other issues, were resolved and an employment agreement was drafted, reviewed, and signed.  (*Id.* ¶ 44.)

Dr. Haig disputes that his employment as OEM section chief was not a "done deal" as of his February 11[5] meeting with Dr. Rothstein, claiming that at that meeting, Dr. Rothstein extended a verbal offer of employment as OEM section chief to Dr. Haig and Dr. Haig accepted that offer.[6]  (*Id.* at 10–11, ¶¶ 44a–b.)  Dr. Haig further claims that, at their February 11 meeting, he and Dr. Rothstein agreed upon the material terms of Dr. Haig's employment with Dartmouth, including his salary ($300,000, guaranteed for two years), the term of the agreement (one year), and the start date (June 1 or July 2019).  (*Id.* at 11, ¶ 44b; 11–12, ¶ 48; 14, ¶ 59a.)  According to Dr. Haig, this manner of entering into an employment agreement was consistent with Dartmouth's practice of making a verbal offer of employment to a candidate once certain terms, including salary, were determined, and working out the other details later.  (*Id.* at 9, ¶¶ 36a–b.)

On February 13, Dr. Rothstein reported to several interested parties at Dartmouth that they were ready to start work on an "offer letter," i.e., an employment contract, for Dr. Haig.  (*Id.* at 12, ¶ 49.)  On February 15, Dr. Haig emailed Dr. Rothstein to confirm that they had "agreed to move along with contract negotiations and other aspects of [building an occupational medicine program and launching PM&R at Dartmouth]."  (Doc. 50-13 at 1.)  Dr. Haig attached to the email a detailed letter, dated February 14, in an effort "[t]o help . . . along" the negotiation process, stating in the email: "it['']s a start."  (*Id.*)  In the letter, Dr. Haig stated that he was "delighted that we're coming closer to joining forces to build occupational and rehabilitation medicine at Dartmouth-Hitchcock," that "we're [now] at the point of sorting out details," and

---

[5]  Unless otherwise noted, all dates refer to the year 2019.

[6]  Although he currently claims that the parties entered into an employment contract on February 11, 2019, Dr. Haig asserted in the Complaint that the contract was formed in March 2019.  (*See* Doc. 1 at 4, ¶¶ 7–8.)

that "[w]e both agree that we should come to a formal agreement as soon as possible." (*Id.*)
Dr. Haig further stated in the letter that he would need "assurances" that he would have a secure
job at Dartmouth *for five years* before he would "feel secure in taking the personal risk" of
taking on the new role as OEM section chief at Dartmouth. (*Id.*)  In his Opposition to
Dartmouth's Motion for Summary Judgment, however, Dr. Haig states that this statement about
his need for a five-year term of employment with Dartmouth was not accurate as of the date he
sent the February 14 letter to Dr. Rothstein. (Doc. 55 at 6 n.5.)  Rather, Dr. Haig claims that he
and Dr. Rothstein agreed at their February 11 meeting—notwithstanding the contrary language
in Dr. Haig's February 14 letter—that the term of employment was one year. (Doc. 55-1 at 11,
¶ 44b.)

Dr. Haig's February 14 letter also states that he would "begin the process for a New
Hampshire [medical] license," which he understood would take three months (Doc. 50-13 at 2),
but that he would not "begin to mothball Haig Physical Medicine" until there was a signed
contract (*id.* at 4). (*See* Doc. 55-1 at 14, ¶ 60.)  Finally, the February 14 letter discusses certain
issues that had not yet been determined: when Dr. Haig would start employment with Dartmouth,
how Dartmouth and Dr. Haig would manage the relevant conflicts of interest with respect to
Dr. Haig's consulting business, and what Dr. Haig's time allocation regarding job duties would
be. (*Id.* ¶ 58.)

On February 25, Dr. Haig stated in an email to a Dartmouth employee that "[Dr.
Rothstein] made an informal offer [of employment,] and pending details[,] I intend to accept."
(Doc. 50-15 at 1.)  Also around that time, Dr. Rothstein began drafting an employment
agreement to present to Dr. Haig for his review and approval. (Doc. 55-1 at 16, ¶ 64.)  As part of
that process, Dr. Rothstein had discussions with several interested individuals at Dartmouth,

including Dr. Murray, Dr. Sally Kraft (vice president of Dartmouth's population health program), and Mary Evanofski (vice president of Clinical Operations at Dartmouth), particularly to discuss what Dr. Haig's full-time equivalent (FTE) allocation would be, given that he was not an OEM physician.  (*Id.*)

In a March 14 email to Dr. Rothstein, Dr. Haig advised that his New Hampshire medical license application was "in order" and that he was waiting for his letters of reference.  (Doc. 50-16 at 2.)  A few days later, on March 19, Dr. Haig sent another email to Dr. Rothstein, advising that he was "working with staff . . . in Burlington [to] clos[e] down [his] practice."  (*Id.* at 1.) Also in that March 19 email, Dr. Haig inquired as to when the lawyers would be done drafting his employment contract, and stated, "[w]e really can't get the clock ticking until the contract with Dartmouth is signed."  (*Id.*)  Dr. Haig and Dr. Rothstein spoke on March 20, and Dr. Rothstein advised that they were still working on a proposed employment agreement.  (Doc. 55-1 at 17, ¶ 70.)  Also during that conversation, Dr. Haig agreed to close both his clinical practice and his consulting business if he became OEM section chief, to avoid any possible conflicts of interest.  (*Id.*)  On March 27, Dr. Rothstein relayed to several senior leadership members at Dartmouth that Dr. Haig had "agreed to end both his physical medicine practice AND his consulting LLC business, thereby mitigating the need to manage outside business interests."  (Doc. 55-26 at 2.)

At some point after the February 11 meeting, at Dr. Rothstein's recommendation, Dr. Haig and his wife began working with a real estate agent to purchase a house in the Hanover/Lebanon, New Hampshire area to enable Dr. Haig to be close to Dartmouth.  (Doc. 55-2 at 12, ¶ 22.)  In a March 20 email to their real estate agent, Dr. Haig's wife stated that she and Dr. Haig were "seriously considering" a house in Sharon, New Hampshire, but advised that they

would like to see the house "one more time when [Dr. Haig's] contract is settled."  (Doc. 50-17 at 2.)

In early April 2019, Dr. Rothstein was continuing to work on an employment contract for Dr. Haig, including a proposed FTE allocation.  (Doc. 55-1 at 17, ¶ 72.)  Around the same time, Dr. Rothstein's assistant emailed Dr. Haig to request that he complete a required "pre-employment application" (PEA) form, which Dr. Haig completed, signed, and returned to Dr. Rothstein the next day, April 3.  (*Id.* ¶ 73.)  In relevant part, the PEA includes the following provisions: (a) "[n]othing contained in the documents related to [Dr. Haig's] application for employment, or conveyed to [him] during any interview [he] may have, is intended to create a contract of employment with [Dartmouth]" (Doc. 50-20 at 8, ¶ 3); (b) if Dr. Haig was hired by Dartmouth, his employment would be "at will" (*id.*); and (c) any offer of employment from Dartmouth would be contingent on information obtained from Dr. Haig's background checks, leaving Dartmouth free to withdraw an offer of employment or terminate employment based on any background information obtained (*id.* ¶¶ 6, 8).  (*See* Doc. 55-1 at 18, ¶ 75.)

Dr. Rothstein was still working on Dr. Haig's employment contract as of April 4.  (Doc. 50-14 at 1.)  In an email to Dr. Murray, responding to Dr. Murray's statement that Dr. Haig's employment with Dartmouth was not yet a "'done deal,'" Dr. Rothstein stated, "I think we will be fine with [Dr. Haig], but 'it ain't over til it's over.'"  (*Id.*)

Around this same period (early April), Dr. Haig was invited to attend a dinner with Dr. Philip Adamo, a candidate for a position in Occupational Medicine at Dartmouth, and several Dartmouth faculty members.  (Doc 55-2 at 14.)  Dr. Rothstein told Dr. Murray that he thought it was a "good idea" for Dr. Haig to attend this dinner because, "[e]ven if something was to derail with [Dr. Haig], his input and planning would be valuable."  (Doc. 55-11 at 2.)  Dr. Haig

"expressed concern" at the dinner that his employment contract with Dartmouth had not yet been produced, but everyone in the group assured him that the delay was "only due to the complexities of contract writing," and Dr. Evanofski indicated that she was finalizing the contract.  (Doc. 55-2 at 14, ¶ 29.)  Dr. Haig and the other dinner attendees also discussed Dr. Haig's agreement with Dr. Rothstein for Dr. Haig to dissolve his medical practice and consulting business before beginning work with Dartmouth.  (*Id.* at 14–15, ¶ 29.)  According to Dr. Haig, no one at the dinner "cautioned [him] or said anything to the effect that [he] should slow down efforts to shut [down] [his] medical practice."  (*Id.* at 15, ¶ 29.)

On April 11, Dr. Haig advised his real estate agent in an email that he and his wife were "STILL waiting for the official note from Dartmouth" and that he would "keep [him] posted" with respect to the house they were considering.  (Doc. 50-17 at 1.)  On April 22, Dr. Haig again emailed his real estate agent, stating that it was "frustrating that Dartmouth told [him] the contract would likely be ready March 31 and it's not here."  (Doc. 50-21 at 1.)  He further stated that Dartmouth was "still assuring [him] that they're working on [the contract]," but "longer delays don't add confidence that the deal will get done."  (*Id.*)  Although he and his wife were interested in the Sharon house, Dr. Haig reiterated that they "wouldn't bid [on it] until [Dr. Haig] g[o]t a contract[,] or unless the[] [sellers] were willing to drop the price to make it worth the job leap of faith."  (*Id.*)

On April 23, Dr. Haig emailed Dr. Rothstein, stating that although he realized their "March 31 deadline for a contract was aspirational," it was important that they "set some sort of timeline for the contract."  (Doc. 50-22 at 1.)  Dr. Haig further stated that he "needed to take as many preliminary steps that [he] could to prepare staff and patients for a closing date of June 1," and that the "next steps . . . have 1[-]month horizons, so it's important that we get something

9

together by May 1." (*Id.*)  Dr. Rothstein replied to Dr. Haig's email on the same date: "That is

the plan!"  He noted that Dartmouth would have "paperwork" to Dr. Haig shortly after the end of

that week.  (*Id.*)  Notwithstanding that email, it was around this period (April 20-30) that

Dr. Rothstein became uncertain about Dr. Haig's candidacy for the OEM section chief position,

given that "additional information" had "c[o]me to light."  (Doc. 55-38 at 3:15; *see* Doc. 50-24

at 1.)

   Specifically, on April 25, Dr. Kevin McGuire, section chief of Dartmouth's Center for

Pain and Spine, emailed Dr. Rothstein and Dr. Merrens to "provide factual information that may

or may not help in making [the] decision" whether to offer the OEM section chief position to

Dr. Haig.  (Doc. 50-23 at 3; *see also* Doc. 50-26 at 1.)  Among other things, Dr. McGuire stated

that Dr. Haig was "considered confrontational and condescending with strong[,] rigid opinions,"

and that "there was a 100% negative review" of Dr. Haig in discussions with five Dartmouth

employees who had met him in the past.  (Doc. 50-23 at 3.)  Dr. McGuire further advised of what

he considered a "red flag":  Dr. Haig had "signed in as his own patient on Vitals.com[,] . . . and

gave himself 5/5 stars and wrote a response to the negative reviews he had received."  (*Id.*)  In

fact, on October 15, 2018, Dr. Haig had submitted a five-star self-review on Vitals.com, a

website that publishes patient reviews of doctors, suggesting that the negative reviews about him

were written by mentally ill patients who were addicted to pain medication.  (Doc. 55-1 at 6–7,

¶ 28; *see* Doc. 50-10 at 4.)

   On April 26, Dr. Merrens emailed Dr. Rothstein to request an "update" regarding

Dr. Haig's candidacy for the OEM section chief position and to advise that he and Dr. Padin

"have some new evolving concerns about [Dr.] Haig's candidacy and recruitment in

Occ[upational] Med[icine][.]"  (Doc. 55-4 at 2.)  Dr. Evanofski responded to that email as

follows: "I feel bad for leading [Dr. Haig] on[,] but I really don't think we have a good, solid plan for him." (*Id.*)

Also on April 26, Dr. Rothstein emailed Dr. Merrens about the new information contained in Dr. McGuire's April 25 email: "Yes[, it is o]dd that he would review himself rather than just state the perspective he posted," and, "I think we need more discussion amongst ourselves and then an honest dialogue with [Dr. Haig] about our concerns." (Doc. 50-24 at 1.) On May 5, Dr. Rothstein emailed Dr. McGuire about his April 25 email, advising that he was "looking into" Dr. Haig's internet self-review, but stating that nonetheless Dr. Haig's "academic strength is impressive[] and needs to be factored into the decision of an offer." (Doc. 50-26 at 1.) Dr. Rothstein further stated that he wanted to discuss with Dr. McGuire "what [Dr. McGuire had] learned from [his] colleagues about [Dr. Haig's] behavior/personality [because] . . . [i]t will be important to know what is fixed and what could be addressed and changed with intervention." (*Id.*)

On May 1, Dr. Haig asked Dr. Rothstein if it was "OK to tell patients" that he had been "invited to be chair of [OEM]." (Doc. 50-25 at 1.) As Dr. Haig explained, "[t]hat alone will take you off the hook for a May 1 deadline for the contract, and let us get on with the move." (*Id.*) Dr. Rothstein responded that he was meeting with Dr. Merrens the next day and would "get back with [Dr. Haig] after" that meeting. (*Id.*) Dr. Haig replied that "certainty about dates is most important." (*Id.*)

By around this time, Dr. Rothstein was aware that Dr. Haig had begun the process of closing his medical practice, as he stated in an April 27 email to Dr. Merrens that Dr. Haig's efforts to close his practice were already "underway." (Doc. 55-25 at 2.) Dr. Rothstein observed

in a May 2 email to Dr. Kraft that "[w]e are pretty far down the road with [Dr. Haig]" as he is "[c]losing [his] practice and giving up his other business."  (Doc. 55-33 at 2.)

On May 7, Dr. Rothstein asked Dr. Haig to return for a third round of interviews.  (Doc. 55-1 at 20, ¶ 86.)  Dr. Haig was "confused" (Doc. 55-2 at 16, ¶ 34) and "furious" (Doc. 50-32 at 32:7), telling Dr. Rothstein that they "already had an agreement" (*id.* at 32:3).  But Dr. Haig "held [his] breath and thought [he]'d give it one more chance[] because there are a lot of political machinations in universities, and you never know how these things come out."  (*Id.* at 32:7–10.) Dr. Rothstein told Dr. Haig that "it was just a question of hospital politics."  (Doc. 55-2 at 16, ¶ 34.)  Dr. Haig's third round of interviews occurred on May 13 (Doc. 55-1 at 21, ¶ 88), after which Dr. Rothstein received unfavorable feedback (*id.* ¶ 90).  Specifically, the interviewers expressed concerns regarding, among other things: (a) Dr. Haig's interest in direct patient care, (b) negative reviews that Dr. Haig received from prior colleagues in other institutions, and (c) the fact that Dr. Haig was not an occupational medicine physician.  (*Id.*)  One physician opined that it would be a "mistake" to employ Dr. Haig at Dartmouth (Doc. 50-27 at 15), and another stated that she no longer believed Dr. Haig was "the appropriate candidate for the [position]" (*id.* at 13).  Despite this negative feedback, Dr. Haig claims Dr. Rothstein "assured [him] that [Dr. Rothstein] anticipated no problems" regarding Dr. Haig's candidacy for the OEM section chief position.  (Doc. 55-2 at 16, ¶ 34.)

Before the May 13 interviews were conducted, Dr. Rothstein had received a revised employment contract for Dr. Haig from legal counsel.  (Doc. 55-1 at 21, ¶ 89.)  The contract was never finalized, however.  (*Id.*)  On May 17, Dr. Rothstein informed Dr. Haig that Dartmouth

was no longer pursuing the possibility of employing him as OEM section chief.[7]  (*Id.* at 22, ¶ 91.)

Dr. Haig filed the Complaint in this action on October 7.  (Doc. 1.)  After discovery, Dartmouth filed the pending Motion for Summary Judgment and memorandum of law on January 13, 2022 (Docs. 50, 50-1), and a Statement of Undisputed Material Facts and supporting evidence. (Docs. 50-2, 50-3 through 50-32).  Dartmouth seeks dismissal of all claims, arguing that they fail as a matter of law principally because: (a) Dartmouth never made an offer of employment to Dr. Haig, and (b) Dr. Haig cannot demonstrate either reasonable or detrimental reliance on any promise of future employment with Dartmouth.  (*See* Doc. 50-1 at 17, 21.)

On March 25, 2022, Dr. Haig filed an Opposition to the Motion for Summary Judgment (Doc. 55), a Statement of Disputed Material Facts (Doc. 55-1) and supporting evidence (Docs. 55-2 through 55-41).  Dr. Haig contends that summary judgment should be denied because there are disputed issues of material fact, including whether the parties entered into a verbal contract of employment and whether Dartmouth encouraged and was aware of Dr. Haig's detrimental reliance on either that contract or on Dartmouth's promise of future employment.  (*See* Doc. 55 at 18, 24, 28.)

In its Reply to Dr. Haig's Opposition, Dartmouth lists various statements and actions of Dr. Haig that allegedly demonstrate there was no contract or promise of employment as of February 11 or any time thereafter.  (*See* Doc. 59 at 1–6.)  Additionally, Dartmouth maintains that as a sophisticated businessman and medical practitioner, Dr. Haig was aware that he would

---

[7]  In a May 15 email, Dr. Evanofski commented on the termination of Dr. Rothstein's employment discussions with Dr. Haig: "[Dr. Rothstein] will call [Dr. Haig] today and back off the offer.  He will tell [Dr. Haig] that they are rethinking the combination of the[] [Occupational Medicine/Physiatrist] sections and will likely post a section chief position for PM&R in the future which he could apply to . . . . This is actually a relief.  [Dr. Rothstein] offered a Section Chief/Occ[upational] Med[icine] position to Dr. Phil Adamo yesterday."  (Doc. 55-5 at 2.)

not be offered a leadership position at a medical center for a salary of $300,000 without a signed written contract.  (*Id.* at 12.)

On November 10, 2022, the Court held a hearing on Defendants' Motion for Summary Judgment.

## **Analysis**

### I.     **Standard of Review**

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248.  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.*  If the moving party on a motion for summary judgment demonstrates that there are no genuine issues of material fact, the burden shifts to the nonmoving party, who must present "'significantly probative supporting evidence' of a disputed fact."  *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (quoting *Anderson*, 477 U.S. at 249).  Where the nonmoving party "'fail[s] to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor' on an essential element of a claim on which the [nonmoving party] bears the burden of proof," the moving party is entitled to summary judgment.  *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 22 (2d Cir. 2012) (quoting *In re Omnicom Grp., Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)).

In considering a motion for summary judgment, the court is "required to resolve all ambiguities and draw all factual inferences in favor of the nonmovant."  *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted); *see SEC v.*

*Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) ("party against whom summary judgment is sought [must be] given the benefit of all permissible inferences and all credibility assessments").  But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  He or she "cannot defeat summary judgment by relying on the allegations in his complaint, conclusory statements, or mere assertions that affidavits supporting the motion are not credible." *Hamlett*, 496 F. Supp. 2d at 328 (citing *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *see Dasher v. N.Y.C. Police Dep't*, No. 94 CV 3847(SJ), 1999 WL 184118, at *1 (E.D.N.Y. Mar. 18, 1999) ("[T]he court should grant summary judgment where the nonmoving party's evidence is merely colorable, conclusory, speculative, or not significantly probative.").

The court's role in adjudicating a motion for summary judgment "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

## II.    Choice of Law

A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)).  For choice-of-law questions in contract cases, when the contracting parties have not clearly specified the state law to be applied, Vermont has adopted the test in § 188 of the Restatement (Second) Conflict of

Laws to determine which state has the most significant relationship to the transaction and the parties. *Evergreen Bank, N.A. v. Sullivan*, 980 F. Supp. 747, 750 (D. Vt. 1997); *see McKinnon v. F.H. Morgan & Co.*, 170 Vt. 422, 424, 750 A.2d 1026, 1028 (2000).  The Court considers the following Restatement factors: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation[,] and place of business of the parties." *Pioneer Credit Corp. v. Carden*, 127 Vt. 229, 233, 245 A.2d 891, 894 (1968) (internal quotation marks omitted); *see McLaughlin v. Langrock Sperry & Wool, LLP*, Case No. 2:19-cv-00112, 2021 WL 535873, at *8 (D. Vt. Feb. 12, 2021).  The most important of these factors are the place of contracting and the place of performance. *Pioneer Credit Corp.*, 127 Vt. at 233, 245 A.2d at 894.  Based on the above facts, New Hampshire was the anticipated place of performance, the location of the subject matter of the contract, the location of Dartmouth, and apparently the location of much of the negotiation of the intended agreement.  Therefore, these factors initially suggest that New Hampshire law should apply in this case.  (*See* Doc. 50-1 at 16.)

According to Vermont's choice-of-law rules, however, the Court must first consider whether the applicable laws of the two jurisdictions are in conflict. *Long v. Parry*, 921 F. Supp. 2d 269, 274 (D. Vt. 2013).  Where there is no conflict, Vermont courts avoid the choice-of-law question and apply the law of the forum state. *Id.* (citing *Havill v. Woodstock Soapstone Co.*, 172 Vt. 625, 627, 783 A.2d 423, 427 (2001)).  The proponent of the law of another jurisdiction—Dartmouth in this case—bears the burden of demonstrating that the foreign law conflicts with Vermont law. *In re Ambassador Ins. Co.*, 2022 VT 11, ¶ 17, 275 A.3d 122, 127.  As the Vermont Supreme Court recently observed, "[t]he law of another jurisdiction, or foreign law, 'is

a question of fact and must be proved as such.'" *Id.* (quoting *Gen. Acceptance Corp. v. Lyons*, 125 Vt. 332, 335, 215 A.2d 513, 515 (1965)).  When the proponent of foreign law does not demonstrate a conflict, the foreign law "is presumed to be the same as the law of Vermont." *Gen. Acceptance Corp.*, 125 Vt. at 335, 215 A.2d at 515; *see Pioneer Credit Corp.*, 127 Vt. at 234, 245 A.2d at 894 (applying Vermont law where proponent of Massachusetts law failed to prove conflict and where court found assumption that Massachusetts law "is like our own" was "reasonable" and "does not impose oppressive consequences").

Although Dartmouth advocates for application of New Hampshire law, it acknowledges that New Hampshire law and Vermont law do not appear to differ materially on the legal issues raised by Dr. Haig's claims.  (*See* Doc. 50-1 at 16–17.)  Moreover, Dartmouth largely cites Vermont caselaw in its Motion for Summary Judgment and Reply.  (*See* Doc. 50-1 at 17–20, 22; Doc. 59 at 6–8, 10.)  Accordingly, the Court applies Vermont law to the pending Motion, given that (i) Dartmouth has not demonstrated a conflict between New Hampshire and Vermont law; (ii) Dr. Haig is a Vermont resident; and (iii) Dr. Haig filed this federal lawsuit in Vermont.  *See Long*, 921 F. Supp. 2d at 274; *Audsley v. RBS Citizens, N.A.*, No. 5:10-CV-208, 2012 WL 4088762, at *3 (D. Vt. Sept. 17, 2012).

## III.   Breach of Contract

Dr. Haig claims that on February 11, 2019, he and Dartmouth verbally agreed to the material terms of a contract of employment, including rate of pay, length of initial term, allocation of professional time, anticipated start date, and the steps Dr. Haig would be expected to complete prior to his start date.  (*See* Doc. 55 at 18; *see also* Doc. 50-32 (Haig depo.) at 21–25, 27–28.)  Dr. Haig further claims to have accepted those terms on the same date, resulting in the formation of a contract for employment as OEM section chair at Dartmouth as of February

11, 2019.  (*Id.*; *see also* Doc. 1 at 13.)  After the contract was formed, Dr. Haig claims to have

taken steps to begin performance, including for example obtaining a New Hampshire medical

license, applying for hospital privileges at Dartmouth, locating suitable housing in the area,

attending the interview of a candidate for a related position at Dartmouth who would work under

Dr. Haig, and moving towards closing his medical practice and consulting business.  (*See* Doc.

55 at 20; *see also* Doc. 1 at 14, ¶ 65; Doc. 50-16 at 1–2; Doc. 50-22 at 1; Doc. 55-2 at ¶¶ 15, 18,

20–26.)

  Dartmouth argues that the undisputed material facts demonstrate there was no agreement

as to the essential terms of an employment contract between Dr. Haig and Dartmouth as of

February 11 (or any other date), and therefore Dr. Haig's breach of contract claim should be

summarily dismissed.  (Doc. 50-1 at 17–19.)  Specifically, Dartmouth contends that Dr. Haig and

Dr. Rothstein had not agreed on Dr. Haig's starting date at the February 11 meeting, and that

Dr. Haig's own contemporaneous statements and actions after the meeting demonstrate that

Dr. Haig did not believe Dr. Rothstein's representations at the meeting were anything more than

"expressions of hope" that "cannot be held to bind the employer."  (*Id.* at 17 (internal quotation

marks omitted).)

  In a breach of contract action, it is axiomatic that "to have a breach, there must be a

contract."  *Ben & Jerry's Homemade, Inc. v. Coronet Priscilla Ice Cream Corp.*, 921 F. Supp.

1206, 1212 (D. Vt. 1996).  It is not enough to claim "in a conclusory manner" that an agreement

was breached.  *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008).  To sustain a

claim for breach of contract, the plaintiff must demonstrate "the existence of an enforceable

contract, through specific allegations about the parties to the agreement, the date of the contract's

formation, and the contract's major terms."  *Rodriguez v. It's Just Lunch, Int'l*, No. 07 Civ.

9227(SHS)(KNF), 2010 WL 685009, at *10 (S.D.N.Y. Feb. 23, 2010) (internal quotation marks omitted) (dismissing breach-of-contract claim, where plaintiffs failed to allege "essential terms" of contracts, including when they were signed).  It is "a basic tenet of the law of contracts that in any agreement . . . [,] the offer and acceptance must be concurrent and there must be mutual manifestations of assent or a meeting of the minds on all essential particulars[;] [t]he parties must agree to the same thing in the same sense." *Evarts v. Forte*, 135 Vt. 306, 309, 376 A.2d 766, 768 (1977) (internal quotation marks omitted).  "[W]hile a binding agreement need not contain each and every contractual term, it must contain all of the material and essential terms." *Quenneville v. Buttolph*, 2003 VT 82, ¶ 16, 833 A.2d 1263, 1270.  "[V]agueness, indefiniteness[,] and uncertainty of expression as to *any* of the essential terms of an agreement have been held to preclude the creation of an enforceable contract . . . .]" *Id.* at ¶ 14, 833 A.2d at 1269 (quoting *Evarts*, 135 Vt. at 310, 376 A.2d at 769).

In cases where there is not a fully executed contract, Vermont courts consider the following factors in determining whether the parties intended to be bound: (1) whether either party expressly reserved the right not to be bound before the agreement was fully executed; (2) whether either party partially performed the contract; (3) *whether all substantive terms of the contract were agreed upon*; and (4) whether the agreement is of the type typically committed to writing.  *Mount Snow Ltd. v. ALLI, the All. of Action Sports*, No. 1:12–cv–22–jgm, 2013 WL 4498816, at *3 (D. Vt. Aug. 21, 2013) (citing *Catamount Slate Prods., Inc. v. Sheldon*, 2003 VT 112, ¶ 17, 845 A.2d 324, 329); *Bandy Lee v. Yale Univ.*, Civ. No. 3:21CV00389(SALM), 2022 WL 3867539, at *9 (D. Conn. Aug. 30, 2022) ("A contract implied in fact, like an express contract, depends on actual agreement.  [T]he party charged must have agreed, either by words

or action or conduct, to undertake a contractual commitment to the party seeking to enforce such a commitment." (alteration in original) (citations and internal quotation marks omitted)).

The record demonstrates that Dr. Haig and Dr. Rothstein had not agreed on Dr. Haig's start date or his term of employment at their February 11 meeting, or on any date thereafter. Regarding the start date, Dr. Haig initially asserts in his Statement of Disputed Material Facts that he and Dr. Rothstein agreed to "a start date of July" at their February 11 meeting. (Doc. 55-1 at 11, ¶ 44b; *id.* at 14, ¶ 59a.) Not only is this assertion vague, given that there are thirty-one days in the month of July, but Dr. Haig also states that the parties agreed "that he needed to be ready to start on or about June 1st." (*Id.*) Dr. Haig also states in his Statement of Disputed Material Facts that he and Dr. Rothstein agreed that his start date would be "mid[-]summer," which conflicts with his statement in the same paragraph that the start date would be "as close to June 1 as possible," i.e., in late-spring or early summer. (*Id.* at 13, ¶ 52a.) In his Declaration, Dr. Haig states that he and Dr. Rothstein agreed to a start date of "July 1" at the February 11 meeting. (Doc. 55-2 at 10, ¶ 16.) When asked at his October 6, 2021 deposition what he and Dr. Rothstein agreed on February 11 would be his start date, Dr. Haig stated: "[t]hat's the one part [of the agreement] that was left up in the air." (Doc. 50-32 at 21.) Likewise, Dr. Rothstein stated at his October 18, 2021 deposition that he and Dr. Haig had agreed to only a "rough" starting date: "roughly in the mid[-]summer or . . . July or so of the summer." (Doc. 55-39 at 6.) The evidence therefore demonstrates that Dr. Rothstein and Dr. Haig had not agreed on an essential term of their agreement, Dr. Haig's start date.

The evidence also demonstrates that the parties had not agreed on another essential term of their agreement: the term of Dr. Haig's employment. Dr. Haig claims that he and Dr. Rothstein agreed at the February 11 meeting that the term of employment would be one year

(*see* Doc. 55-1 at 11, ¶ 44b), specifically explaining in his Opposition that when Dr. Rothstein informed him at the February 11 meeting that a *one-year initial term* was "standard," Dr. Haig "acquiesced" (Doc. 55 at 6 n.5 (citing Haig depo., Doc. 50-32 at 22; Haig decl., Doc. 55-2 at 10, ¶ 16)).  But the evidence demonstrates otherwise.  First, Dr. Haig states later in his Opposition that he and Dr. Rothstein agreed that his employment was "guaranteed for two years," which would suggest a *two-year term* of employment.  (*Id.* at 7.)  Second, each of these possible terms conflicts with Dr. Haig's statement in his February 14 letter to Dr. Rothstein that he required a *five-year term*.  (Doc. 50-13 at 1.)

In his Statement of Disputed Material Facts, Dr. Haig discounts his own written statement about a five-year term, explaining that the February 14 letter was "something he had 'put together before [his] second interview' on February 11, 2019;" that "some of what was in the . . . letter was resolved [before the letter was sent];" and that he "had not re-read the letter in great detail before he sent it."  (Doc. 55-1 at 13, ¶ 55a.)  But these claims are implausible, considering that (a) the February 14 letter specifically references the February 11 meeting (*see* Doc. 50-13 at 2), and (b) on February 13, Dr. Haig used the present, not past, tense in advising Anne Hill, Dr. Rothstein's assistant, that he was working on writing a letter to Dr. Rothstein, stating, "I'm writing a detailed note [to Dr. Rothstein] so that he can consider different actions and steps" (Doc. 59-1 at 1).  In his attempt to discredit the "five-year term" language contained in his February 14 letter, Dr. Haig cites a portion of his deposition that does not appear to have been submitted to the Court.  (*See* Doc. 55-1 at 13, ¶ 55a (citing "Haig Dep. 75:17–76:4").)  Even if this evidence had been submitted, it would not be sufficient to create a disputed issue given the clear evidence indicating that the parties had not agreed on the term of Dr. Haig's employment at the February 11 meeting.  *See Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 476–77

(S.D.N.Y. 2003) (holding that "when evidence is so contradictory and fanciful that it cannot be

believed by a reasonable person, it may be disregarded [on summary judgment]" because "a

party cannot rely upon implausible testimony to create a triable issue of fact"); *Scott v. Harris*,

550 U.S. 372, 380 (2007) (holding that when a party's story "is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the

facts for purposes of ruling on a motion for summary judgment"); *Pina v. The Children's Place*,

740 F.3d 785, 799 (1st Cir. 2014) (holding that "where the plaintiff relies almost exclusively on

his own testimony, much of which is contradictory and incomplete, it will be impossible for a

district court to determine whether . . . there are any 'genuine' issues of material fact, without

making some assessment of the plaintiff's account" (omission in original) (internal quotation

marks omitted)).

Furthermore, Dr. Haig's statements and actions after his February 11 meeting with

Dr. Rothstein indicate that Dr. Haig did not believe he had an employment contract with

Dartmouth as of the date of that meeting or subsequently.  For example, in the February 14 letter

to Dr. Rothstein, Dr. Haig stated that he was "delighted that we're coming closer to joining

forces" (Doc. 50-13 at 2); that he and Dr. Rothstein were "at the point of sorting out details" and

"should come to a formal agreement as soon as possible" (*id.*); that the parties agreed

Dr. Rothstein's offer would be "revise[d] . . . based on [Dr. Haig's] qualifications" (*id.*); and that

Dr. Haig awaited feedback from Dr. Rothstein regarding the "preliminary time allocation plan"

laid out in the letter (*id.* at 5).  Moreover, in his February 15 email to Dr. Rothstein, Dr. Haig

stated that, at their February 11 meeting, they had "agreed to move along with contract

negotiations" and, to that end, Dr. Haig had "put together a detailed set of thoughts" as "a start"

to that process.  (*Id.* at 1.)  This language demonstrates that Dr. Haig did not believe he had

entered into an employment contract with Dartmouth at the February 11 meeting.

Additionally, in a February 25 email to a third party, Dr. Haig stated that Dr. Rothstein

had "made an informal offer" and that, "pending details," he "intend[ed] to accept [it]."  (Doc.

50-15 at 1.)  This email reflects Dr. Haig's understanding that, two weeks after the February 11

meeting, he had not yet accepted an offer of employment from Dartmouth.  This understanding is

echoed in a March 19 email from Dr. Haig to Dr. Rothstein, in which Dr. Haig stated that he

could not "get the clock ticking" on closing down his Vermont medical practice until he had a

"signed" employment contract with Dartmouth.  (Doc. 50-16 at 1.)  On March 20, Dr. Haig and

his wife informed their realtor that they would like to see the house they were considering

purchasing "one more time," but not until Dr. Haig's contract with Dartmouth was "settled."

(Doc. 50-17 at 2.)  On April 1, Dr. Haig emailed Dr. Rothstein, stating that it was important that

he know "when we plan on having a contract together" because he had already started taking

steps to decommission his practice and he needed to take other steps that would require

"significant lag time" and thus would delay his start date.  (Doc. 50-19 at 2.)  If Dr. Haig thought

he had an employment contract with Dartmouth as of February 11, he would not have made

these statements to Dr. Rothstein and his realtor in March and April.

There is further evidence that Dr. Haig did not believe he had an employment contract

with Dartmouth as of the February 11 meeting or subsequently.  On April 3, Dr. Haig signed

Dartmouth's Pre-Employment Agreement (PEA), which in relevant part provided that

representations during the interview process do not result in an employment contract.  The

provision specifically stated: "Nothing contained in the documents related to my application for

employment, or conveyed to me during any interview I may have, is intended to create a contract

of employment with [Dartmouth]." (Doc. 50-20 at 8.) Moreover, on April 11, Dr. Haig emailed

his realtor to advise that he was "STILL waiting for the official note," i.e., employment contract,

"from Dartmouth." (Doc. 50-17 at 1.) Dr. Haig emailed his realtor again on April 22, noting

that his contract with Dartmouth was still "not here," and that "they're still assuring me that

they're working on it." (Doc. 50-21 at 1.) Dr. Haig acknowledged to his realtor, however, that

"longer delays don't add confidence that the deal will get done." (*Id.*) Dr. Haig again advised

his realtor that he would not bid on the house he and his wife were considering purchasing "until

[he received] a contract [from Dartmouth] or unless [the homeowners] were willing to drop the

price to make it worth the job leap of faith." (*Id.*) These emails clearly demonstrate that

Dr. Haig did not believe he had an employment contract with Dartmouth.

Finally, on May 1, Dr. Haig asked Dr. Rothstein if it was "OK" to inform his patients that

he had "been invited to be chair of Occupational and Rehabilitation Medicine [at Dartmouth]."

In Dr. Haig's phrasing, "[t]hat alone will take you off the hook for a May 1 deadline for the

contract, and let us get on with the move." (Doc. 50-25 at 1.) If Dr. Haig believed that he had an

employment agreement with Dartmouth on that date, he would not have asked Dr. Rothstein if

he could inform patients about an employment relationship with Dartmouth. Also indicative of

the lack of an employment contract between Dr. Haig and Dartmouth as of May 1, Dr. Rothstein

did not respond in the affirmative to Dr. Haig's question, instead advising Dr. Haig that he would

provide a response after he met with Dr. Merrens the next day. (*Id.*)

With respect to Dr. Rothstein, although he "was confident" after his February 11 meeting

with Dr. Rothstein that the employment agreement with Dr. Haig "eventually would get done"

(Doc. 55-1 at 10, ¶ 44), his subsequent communications and actions indicate that a contract was

never finalized, and by late April/early May his opinion had changed on whether Dartmouth

should undertake an employment contract with Dr. Haig.  Specifically, two days after the February 11 meeting, Dr. Rothstein reported to several interested parties at Dartmouth that they were ready to start work on an "offer letter" (i.e., an employment contract) for Dr. Haig, and Dr. Rothstein began drafting the contract to present to Dr. Haig for his review and approval.  (*Id.* at 12, ¶ 49; 16, ¶ 64.)  In March and early April, Dr. Rothstein advised Dr. Haig that he was working on a proposed employment agreement, including a proposed FTE allocation, and Dr. Rothstein's assistant emailed Dr. Haig the required PEA form for Dr. Haig to complete.  (*Id.* at 17, ¶¶ 70–73.)  In an April 4 email to a Dartmouth faculty member, Dr. Rothstein reiterated his belief that the employment agreement with Dr. Haig would likely be finalized, but acknowledged that the agreement was not yet a "'done deal,'" stating that "'it ain't over til it's over.'"  (Doc. 50-14 at 1.)

Although Dr. Rothstein informed Dr. Haig on April 23 that Dartmouth would have "paperwork" to him shortly after the end of that week (Doc. 50-22 at 1), on or around April 26, Dr. Rothstein learned about negative feedback from Dartmouth faculty, including Dr. McGuire, Dr. Merrens, and Dr. Padin, regarding Dr. Haig's candidacy for the OEM section chief position (*see* Doc. 50-23 at 2–3; Doc. 50-24 at 1–2; Doc. 50-26 at 1–2; Doc. 50-30 at 1–2).  On or around the same date, Dr. Rothstein learned of Dr. Haig's positive self-review on Vitals.com and Dr. Haig's statement that "chronic pain sometimes comes with addiction and severe mental illness," an apparent insinuation that the negative reviewers on the site experienced such conditions.  (Doc. 50-10 at 4; *see* Doc. 50-26 at 1–2; Doc. 55-1 at 6–7, ¶ 28.)  On April 26, Dr. Rothstein emailed Dr. Merrens about the new information and stated that they "need[ed] more discussion amongst [them]selves[,] and then an honest dialogue with [Dr. Haig] about [their] concerns."  (Doc. 50-24 at 1.)  Likewise, on May 5, Dr. Rothstein stated in an email to

Dr. McGuire that he was "looking into" Dr. Haig's internet self-review, and would like to discuss with Dr. McGuire "what you have learned from your colleagues about [Dr. Haig's] behavior/personality [because] . . . [i]t will be important to know what is fixed and what could be addressed and changed with intervention."  (Doc. 50-26 at 1.)

On May 7, Dr. Rothstein invited Dr. Haig to return for a third round of interviews, which Dr. Haig attended on May 13.  (Doc. 55-1 at 20, ¶ 86; 21, ¶ 88.)  Although Dr. Rothstein received some favorable feedback about Dr. Haig following these interviews, he also received unfavorable comments from evaluators.  (*Id.* at 21, ¶¶ 90, 90a; *see* Doc. 50-27 at 9 ("He does not seem interested or passionate about direct patient care[,]" and "he remains committed to self-aggrandizement and self-promotion beyond what would normally be reasonable."), 13 ("I do not believe he is the appropriate candidate for section chief."), 15 ("He is not an Occ[upational] Med[icine] doc[tor].  [H]e has no interest in taking care of patients.  He is a mistake for this organization.").)  After "careful consideration," Dr. Rothstein decided it was not in Dartmouth's interest to continue to try to employ Dr. Haig as OEM section chief.  (Doc. 55-1 at 22, ¶ 92.)  Dr. Rothstein therefore never finalized Dr. Haig's employment contract (*id.* at 21, ¶ 89), and he informed Dr. Haig on May 17 that Dartmouth was no longer pursuing the possibility of employing him as OEM section chief (*id.* at 22, ¶ 91.)

These material facts demonstrate that there was no employment contract between Dr. Haig and Dartmouth.  In fact, although it is true that mere "preliminary agreements"—i.e., agreements "where the parties acknowledge that they intend to hammer out [the] details . . . subsequently"—may bind the parties, *Art & Fashion Grp. Corp. v. Cyclops Prod., Inc.*, 120 A.D.3d 436, 438, 992 N.Y.S.2d 7 (1st Dept 2014) (internal quotation marks omitted), there are

no genuine issues of material fact that Dr. Haig and Dartmouth agreed to even a preliminary employment agreement.

Therefore, the Court grants summary judgment to Dartmouth on Dr. Haig's breach of contract claim.[8]

## IV.    Promissory Estoppel

According to Dartmouth, Dr. Haig's promissory estoppel claim fails as a matter of law because: (a) promissory estoppel does not apply where the parties' employment relationship is governed by a contract; (b) by signing Dartmouth's PEA, Dr. Haig agreed that nothing stated to him during the hiring process could constitute an enforceable promise of employment, and Dartmouth reserved the right to rescind any promise of employment based on information obtained from background checks of Dr. Haig; (c) Dr. Haig cannot invoke promissory estoppel against Dartmouth merely for Dartmouth's failure to employ Dr. Haig as an at-will employee; (d) the undisputed facts do not establish that Dr. Rothstein verbally promised Dr. Haig that his employment as OEM section chief was a "done deal" as of February 11; and (e) even assuming Dr. Rothstein made an actionable promise to hire Dr. Haig on February 11, Dr. Haig cannot demonstrate reasonable or detrimental reliance on that promise or that injustice can be avoided only by enforcement of the promise.

Dr. Haig responds that he is entitled to damages under a promissory estoppel theory because he took steps in reasonable reliance on Dartmouth's promise to employ him as OEM section chief and was left in a disadvantageous position when Dartmouth reneged on that

---

[8]  In addition to its argument that there was no agreement between the parties regarding the material terms of an employment contract with Dr. Haig, Dartmouth presents several alternative bases for summary judgment on Dr. Haig's breach of contract claim.  (*See* Doc. 50-1 at 17–19; Doc. 59 at 2.)  Because the Court grants summary judgment on the ground that there is no genuine issue of material fact that the parties did not form an employment contract, it declines to address Dartmouth's alternative breach of contract arguments.

promise.  Dr. Haig claims he suffered financial loss, reputational harm, and family stress as a result of Dartmouth's repudiation of its promise of employment.  Whether or not he would have been an "at-will employee" for Dartmouth, Dr. Haig contends he is nevertheless entitled to recover for damages associated with his reasonable reliance on the offer of employment.

The doctrine of promissory estoppel is typically invoked when the formal requirements of a contract are absent, but the interests of justice require enforcement of a promise.  *See Cweklinsky v. Mobil Chem. Co.*, 364 F.3d 68, 77 (2d Cir. 2004) ("[P]romissory estoppel permits recovery based on a sufficiently clear and definite promise, even in the absence of the consideration required to create a contract.").  To prevail on a claim of promissory estoppel, the plaintiff must show that: "(1) defendant made a promise to plaintiff that defendant should have reasonably expected to induce action or forbearance; (2) plaintiff relied on the promise to his detriment; and (3) injustice can be avoided only by enforcement of the promise." *Pettersen v. Monaghan Safar Ducham PLLC*, 2021 VT 16, ¶ 11, 256 A.3d 604, 609 (citing *Foote v. Simmonds Precision Prods. Co.*, 158 Vt. 566, 573, 613 A.2d 1277, 1281 (1992) (adopting elements in Restatement (Second) of Contracts)); *see Island Indus., LLC v. Town of Grand Isle*, 2021 VT 49, ¶ 39, 260 A.3d 372, 386 ("Promissory estoppel requires (1) a promise on which the promisor reasonably expects the promisee to take action or forbearance of a substantial character; (2) the promise induced a definite and substantial action or forbearance; and (3) injustice can be avoided only through the enforcement of the promise." (internal quotation marks omitted)).

"In determining whether a plaintiff reasonably relied on a defendant's promise, courts examine the totality of the circumstances." *Cressy v. Proctor*, 22 F. Supp. 3d 353, 363 (D. Vt. 2014) (quoting *Tour Costa Rica v. Country Walkers, Inc.*, 171 Vt. 116, 120, 758 A.2d 795, 800

(2000)).  The doctrine of promissory estoppel "evolved to prevent 'injustice and unconscionable advantage' where an exchange of promises did not create a binding contract." *McLaughlin*, 2021 WL 535873, at *16 (quoting *Big G Corp. v. Henry*, 148 Vt. 589, 594, 536 A.2d 559, 562 (1987)); *see Hunter v. Hayes*, 533 P.2d 952 (Colo. App. 1975) (applying doctrine of promissory estoppel to avoid injustice to plaintiff where defendant offered plaintiff a new job, told her to terminate her current job and, in reliance on the promise, plaintiff quit her current job, was not given the new job, and was unemployed for two months).

###### A.      Employment Relationship Governed by Contract

Dartmouth contends that promissory estoppel does not apply where the parties' employment relationship is governed by a contract.  It is correct that "[p]romissory estoppel does not apply when the dispute arises out of a valid contract between the parties." *In re Montagne*, 431 B.R. 72, 88–89 (Bankr. D. Vt. 2010) (citing *LoPresti v. Rutland Reg'l Health Servs.*, 2004 VT 105, ¶ 50, 865 A.2d 1102, 1119.  Given that the Court has found no employment contract between Dr. Haig and Dartmouth, Dr. Haig may advance an alternative theory based on promissory estoppel.

###### B.      Dr. Haig's Agreement to Terms of PEA

Dartmouth further argues that by signing the PEA, Dr. Haig agreed that nothing stated to him in the hiring process could constitute an enforceable promise of employment and that any promise of employment could be rescinded based on Dr. Haig's background checks.

In relevant part, the PEA provided: "[n]othing contained in the documents related to [Dr. Haig's] application for employment, or conveyed to [him] during any interview [he] may have, is intended to create a contract of employment with [Dartmouth]." (Doc. 50-20 at 8, ¶ 3.)  The PEA also provided that "[a]ll offers of employment are contingent upon [Dartmouth's] review of

information obtained from background checks and tests." (*Id.* ¶ 8.)  According to Dr. Haig, notwithstanding this language in the PEA, it was Dartmouth's practice to make verbal offers of employment to candidates once certain terms, such as salary, were determined.  (*See* Doc. 55-1 at 4, ¶¶ 20b–e; 8–9, ¶¶ 36a–c) (citing Physician Recruiter Lisa Minehan's email stating that a "verbal offer can be made to [prospective employee] Dr. Adamo once the salary is determined").  Dr. Haig further claims that, before he signed the PEA, Dr. Rothstein had already made such a verbal offer of employment to him.  (*Id.*; *see also id.* at 18, ¶¶ 74b, 75b.)

Dartmouth does not offer any legal authority for the claim that Dr. Haig's execution of the PEA in April 2019 precludes a promissory estoppel claim based on a promise that was allegedly made to him earlier in February 2019.  Moreover, the PEA provision that all offers of employment are contingent on background checks is immaterial to the promissory estoppel claim, as the evidence suggests that Dartmouth's decision not to present an employment contract to Dr. Haig was unrelated to any issues with Dr. Haig's background checks.

For these reasons, the PEA is not a bar to Dr. Haig's promissory estoppel claim.

### C.    Failure to Employ Dr. Haig as an At-Will Employee

Dartmouth contends that Dr. Haig cannot invoke promissory estoppel for its alleged failure to employ him as an at-will employee.  Dartmouth reasons:

> Allowing a cause of action for promissory estoppel for reliance on employment offers, but not for reliance on continued employment, would make no sense, as it would mean that [Dartmouth] could have terminated Dr. Haig's employment the second he became an employee, but could not rescind any offer of employment up until that point.

(Doc. 50-1 at 21.)  Although courts acknowledge the distinction Dartmouth draws between "reliance on employment offers" and "reliance on continued employment," they have held that fairness considerations require the potential for recovery where a prospective employee

detrimentally relies on the promise of even at-will employment.  This is because the loss to the prospective employee in such situations is the job offer itself, not the job.  *See Robinson v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 108 (D.D.C. 2002) ("Especially in the area of at-will employment, courts recognize losses incident to the reliance upon the job offer itself." (internal quotation marks omitted)); *Peck v. Imedia, Inc.*, 293 N.J. Super. 151, 167, 679 A.2d 745, 753 (App. Div. 1996) ("[W]hat the cases applying the promissory estoppel doctrine recognize is that there may be losses incident to reliance upon the job offer itself, even though the employer can terminate the relationship at any time."); *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 702, 133 N.W.2d 267, 277 (1965) ("The wrong [alleged in the promissory estoppel claim] is not primarily in depriving the plaintiff of the promised reward but in causing the plaintiff to change position to his detriment." (internal quotation marks omitted)).  As the Eighth Circuit explained, the denial of recovery in these circumstances would be inequitable:

> [I]f damages sustained in reasonable reliance on an employer['s] promise were not available, the effect of . . . a rule [forbidding recovery based on reasonable detrimental reliance on an unkept promise not otherwise fully enforceable] would be to allow the employer to take advantage of whatever benefits might accrue to him by his inducing a potential employee to leave behind home and/or steady employment while at the same time being completely free of any obligation to keep his word.

*Bower v. AT&T Techs., Inc.*, 852 F.2d 361, 364 (8th Cir. 1988).  "Clearly a contract which by its terms can be immediately terminated after it is commenced precludes a claimant from maintaining an action upon discharge after hire.  This, however, does not prevent the claimant from recovering damages sustained in reliance on a clear and unambiguous promise that is broken."  *Id.* at 363.  *Bower* persuasively addressed why a rule permitting recovery for detrimental reliance on the promise of an at-will position is necessary:

> While, in practical effect, it may be hard to distinguish the case in which an employee is fired a day after beginning work from the situation in which a potential

employee is prevented from assuming a promised at-will position, the cases *are*
different. In the former case, the employer has completely fulfilled his promise; in
the latter, the promise has not been kept *in any respect* . . . . Such a rule, we believe,
encourages employers to take such promises seriously.

*Id.* at 363–64.

Other courts have applied this reasoning in contexts factually similar to this case. *See,*
*e.g.*, *Lo Bosco v. Kure Eng'g Ltd.*, 891 F. Supp. 1020, 1031 (D.N.J. 1995) (citing *Bower*,
852 F.2d at 365–66) ("There is ample case law for the proposition that a promise of at-will
employment will be sufficiently definite to constitute reliance under promissory estoppel theory
where the promisee has acted to his detriment in taking up the employment."); *Mers v. Dispatch*
*Printing Co.*, 19 Ohio St.3d 100, 105, 483 N.E.2d 150, 155 (1985) ("[W]here appropriate, the
doctrine of promissory estoppel is applicable and binding to oral employment-at-will agreements
when a promise which the employer should reasonably expect to induce action or forbearance on
the part of the employee does induce such action or forbearance, if injustice can be avoided only
by enforcement of the promise."); *Grouse v. Grp. Health Plan, Inc.*, 306 N.W.2d 114, 116
(Minn. 1981) (where health clinic withdrew offer of terminable-at-will pharmacist position to
plaintiff, and where plaintiff had resigned his job with a drugstore and turned down an offer from
a hospital in reliance on the clinic's promise of employment, plaintiff was entitled to damages
measured by "what he lost in quitting the job he held and in declining at least one other offer of
employment elsewhere"); *Hunter*, 533 P.2d at 954; *cf. Cole v. Foxmar, Inc.*, Case No. 2:18-cv-
00220, 2021 WL 5178822, at *14 (D. Vt. Mar. 8, 2021) (finding that under Vermont law
employee may establish claim for wrongful termination under theory of promissory estoppel,
"even if [the] employee otherwise enjoys only at-will employment status" (internal quotation
marks omitted)); *Foote*, 158 Vt. at 571, 613 A.2d at 1280 (noting "promissory estoppel may
modify an at-will employment relationship and provide a remedy for wrongful discharge").

The Court finds the reasoning of these cases persuasive.  Dartmouth does not offer Vermont authority precluding a promissory estoppel claim for reliance on an offer of future at-will employment.  Moreover, the Vermont authority Dartmouth cites on this issue does not compel a different conclusion.  For example, in *Brower v. Holmes Transp., Inc.*, 140 Vt. 114 117 (1981), the plaintiff sought damages for wrongful discharge after the defendant employer dismissed him after four days of a thirty-day trial period.  140 Vt. at 116.  The union contract provided that he could be "discharged without recourse" during the trial period.  *Id*.  Plaintiff asserted an estoppel claim, contending that "he was offered permanent employment, and gave up his existing job in justified reliance upon such a promise."  *Id*. at 117.  The Vermont Supreme Court found that the employer was entitled to summary judgment on the estoppel claim because there was no factual issue that the employer offered to hire the plaintiff on a permanent basis.  In other words, the estoppel claim failed not because the contemplated employment arrangement was "at will," but because "[t]he promise[,] which is the first essential element of promissory estoppel, simply [wa]s not present."  140 Vt. at 117 (citation omitted).

Furthermore, the Vermont Supreme Court has held that promissory estoppel may "modify an at-will employment relationship and provide a remedy for wrongful discharge, as long as the promise made by the employer was of a specific and definite nature and not merely a vague assurance."  *Nelson v. Town of Johnsbury Selectboard*, 2015 VT 5, ¶ 56, 115 A.3d 423, 439 (2015) (citations and internal quotation marks omitted); *see Foote*, 158 Vt. at 571, 613 A.2d at 1280.  Therefore, Vermont law does not preclude a promissory estoppel claim based on an alleged promise of at-will employment where the promise is "specific and definite" and the plaintiff detrimentally relies on the promise.

Accordingly, the Court concludes that promissory estoppel is available to Dr. Haig for his claim of detrimental reliance on an alleged promise of at-will employment.[9]

### D.   Dartmouth's Promise of Employment, Dr. Haig's Detrimental Reliance, and Requirements of Justice

Dartmouth's remaining arguments focus on the legal elements of a promissory estoppel claim.  Dartmouth specifically contends that the undisputed facts demonstrate (1) Dr. Rothstein did not make a promise of employment to Dr. Haig; (2) even if such a promise was made, Dr. Haig did not detrimentally rely on that promise; and (3) it is not the case that injustice can be avoided only by enforcement of the promise.  (Doc. 50-1 at 21.)  As explained below, the Court concludes that there are disputed issues of material fact as to whether Dr. Rothstein made a promise of employment to Dr. Haig and whether Dr. Haig detrimentally relied on that promise.

As noted, a promissory estoppel claim requires the plaintiff to show that (1) the defendant made a promise to the plaintiff; (2) the defendant should have reasonably expected that the promise would induce action or inaction by the plaintiff; (3) the promise actually did induce the plaintiff's action or inaction; and (4) justice requires enforcement of the promise.  *Cressy v. Proctor*, No. 2:12-cv-00262-wks, 2013 WL 1431052, at *3 (D. Vt. Apr. 9, 2013) (citing *Tour Costa Rica*, 171 Vt. at 120, 758 A.2d at 800).  The first three elements "are for the finder of fact, while the determination of whether injustice can be avoided only by the enforcement of the promise is a question of law[.]"  *Boule v. Pike Indus., Inc.*, No. 5:12-cv-7, 2013 WL 711937, at *10 (D. Vt. Feb. 27, 2013) (alteration in original) (citation and internal quotation marks omitted).

---

[9]  Should Dr. Haig succeed on his promissory estoppel claim, damages would be limited to the amount lost in reasonable detrimental reliance on Dartmouth's promise of future at-will employment.  *Hunter*, 533 P.2d at 954. The measure of damages is not based on his expectation of at-will employment with Dartmouth, and therefore would not include lost wages.  *See, e.g., Brueck v. John Maneely Co.*, 131 F. Supp. 3d 774, 778 (N.D. Ind. 2015) ("In the context of a retracted offer for at-will employment, a plaintiff who establishes th[e] elements [of promissory estoppel] can recover any reliance damages sustained as a result of the promise, but they cannot recover any wages they might have earned through that employment.").

"[A]n employer's representations must be interpreted from the perspective of a reasonable employee," and where there is ambiguity, "the meaning of the [employer's] promise, and whether the acts flowing from it were reasonable, are questions of fact for jury determination." *Id.* (alteration in original) (internal quotation marks omitted).

**1.      There are disputed issues of material fact regarding whether Dr. Rothstein made a promise to Dr. Haig that Dr. Rothstein should have reasonably expected would induce Dr. Haig's action or forbearance.**

For purposes of a promissory estoppel claim, a "promise" is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Nelson*, 2015 VT 5, at ¶ 56, 115 A.3d at 439 (quoting Restatement (Second) of Contracts § 2(1) (1981)). "The promise must be more than 'a mere expression of intention, hope, desire, or opinion, which shows no real commitment.'" *Id.* (quoting *Escribano v. Greater Hartford Acad. of Arts*, 449 F. App'x 39, 43 (2d Cir. 2011)). A "vague assurance" will not suffice; rather, "[c]ourts have generally required a promise of a specific and definite nature before holding an employer bound by it." *Dillon v. Champion Jogbra, Inc.*, 175 Vt. 1, 10, 819 A.2d 703, 710 (2002); *see Pettersen*, 2021 VT 16, at ¶ 14, 256 A.3d at 610 (holding that attorney "expressing his opinion that it was reasonable that plaintiff might have the opportunity to become a partner and earn $100,000 annually in five years" did "not suffice to create a promise" of a specific five-year compensation plan, and thus promissory estoppel claim failed). In order to prove a claim for promissory estoppel, the plaintiff must show that the promisor "reasonably expect[ed] to induce action or forbearance on the part of the promisee." *Woodnotch Farms, Inc. v. Agri-Mark, Inc.*, Case No. 2:20-cv-180, 2021 WL 1387112, at *5 (D. Vt. Apr. 13, 2021) (quoting *Heathcote Assocs. v. Chittenden Tr. Co.*, 958 F. Supp. 182, 188 (D. Vt. 1997)).

35

After review of the record evidence, the Court concludes that there are disputed issues of material fact regarding whether Dr. Rothstein's written and oral statements to Dr. Haig at their February 11 meeting and thereafter were specific enough to constitute a "promise" to support a promissory estoppel claim, and whether Dr. Rothstein reasonably expected to induce Dr. Haig's action in reliance on that promise.  Specifically, the evidence demonstrates that Dr. Rothstein told Dr. Haig that he wanted Dr. Haig to be the next OEM section chief, and that Dr. Haig's salary would be $300,000 and the term of employment would be one year subject to renewal. (Doc. 55-1 at 10–14, ¶¶ 43, 44a, 44b, 48, 55a, 57a, 59a.)  Moreover, Dr. Haig claims that Dr. Rothstein asked him to "move with all dispatch to apply for his New Hampshire medical license," which Dr. Haig did.  (*Id.* at 11, ¶ 44b; 14, ¶ 59a; Doc. 50-16 at 2.)  The evidence indicates that there was some urgency to Dartmouth's hiring decision, given that Dr. Murray was holding the OEM section chief position only on an interim basis until June 1, 2019.  (*Id.* at 5, ¶¶ 22, 22b.)  It is a jury question whether Dr. Rothstein should have reasonably expected to induce Dr. Haig's action in reliance on the promise of employment.  Specifically, there were several actions that Dr. Haig had to take before he would be able to begin work as OEM section chief, including completing the credentialing and privileging process at Dartmouth, closing down his private medical practice and consulting business in Vermont, and making arrangements to move from Vermont to New Hampshire.

At the summary judgment stage, the Court must give Dr. Haig "the benefit of all inferences and reasonable doubts."  *Cressy v. Proctor*, Case No. 2:12–cv–262, 2014 WL 12729277, at *2 (D. Vt. Aug. 4, 2014) (internal quotation marks omitted).  While a factfinder might ultimately conclude that Dr. Rothstein's alleged promise to Dr. Haig was not specific enough for a promissory estoppel claim, or that Dr. Rothstein did not reasonably expect to

induce action on the part of Dr. Haig in reliance on the promise, under the applicable legal

standard the record evidence is sufficient to withstand summary judgment on this issue.

> **2.      There are disputed issues of material fact regarding whether Dr. Haig reasonably and detrimentally relied on Dr. Rothstein's promise of employment.**

There are also disputed issues of material fact regarding whether Dr. Haig detrimentally

relied on Dr. Rothstein's promise of employment.  Generally, "[i]n determining whether a

plaintiff reasonably relied on a defendant's promise, courts examine the totality of the

circumstances."  *Tour Costa Rica*, 171 Vt. at 120, 758 A.2d at 800.  In Dartmouth's view,

Dr. Haig did not rely to his detriment on any promise of employment, given that he "did not

close his active practice of medicine, shut down his consulting practice, [and] relocate to the

Upper Valley" before he learned in May 2019 that Dr. Rothstein "was ending negotiations."

(Doc. 50-1 at 22.)  However, there is evidence in the record demonstrating that Dr. Haig applied

for a New Hampshire medical license and hospital privileges at Dartmouth, and took steps to

wind down his medical practice and consulting business in reliance on Dr. Rothstein's alleged

promise of employment.  (*See* Doc. 55-1 at 3, ¶ 12a; 14, ¶ 59a; 17, ¶ 70; 19–20, ¶¶ 82c–d, 83a;

*see also* Doc. 50-16 at 1–2; Doc. 50-22 at 1; Doc. 55-2 at 9, ¶ 15.)  Further, there is evidence

demonstrating that Dr. Haig kept Dr. Rothstein and other Dartmouth faculty members apprised

of these actions, and that Dr. Rothstein acknowledged in March, April, and May 2019 his

awareness that Dr. Haig had agreed to close, and had in fact begun closing, his medical practice

and consulting business.  (*See* Doc. 55-1 at 15, ¶¶ 61b–c; 19–20, ¶¶ 82c–d; *see also* Doc. 55-2

at 14–15, ¶ 29; Doc. 55-20 at 2; Doc. 55-25 at 2; Doc. 55-26 at 2; Doc. 55-33 at 2.)

There is an issue of material fact as to whether Dr. Haig incurred medical practice-related

losses in reliance on Dr. Rothstein's alleged promise of employment.  Dartmouth cites

Dr. Haig's deposition testimony to assert that Dr. Haig "continued to see patients at [Haig Physical Medicine] without interruption since [in or around May 2017]."  (Doc. 55-1 at 3, ¶ 12.) Dartmouth further asserts that Dr. Haig "affirmatively stated on many occasions that he would not [close his medical practice and shut down his consulting practice] before he had a signed contract."  (Doc. 50-1 at 22); *see* Doc. 55-1 at 14, ¶ 60 (Dr. Rothstein Declaration stating that Dr. Haig wrote a February 14, 2019 letter to Dr. Rothstein advising that he would not "begin to mothball Haig Physical Medicine" until there was "a signed contract").  However, Dr. Haig states that he informed Dr. Rothstein that he was "taking steps to close down his practice" (Doc. 55-1 at 15, ¶ 61), and Dr. Rothstein "never told him not to take those steps," (*id.*) (citing emails on April 27 and May 2, 2019 in which Dr. Rothstein noted that Dr. Haig's closing of the clinical practice was "underway").  Dr. Haig further asserts in his Declaration that by the time Dr. Rothstein advised he was no longer under consideration for the job later in May 2019, Dr. Haig had "only a few patients and a skeletal staff."  (Doc. 55-2 at 4-5, ¶ 6.)

Drawing all factual inferences in Dr. Haig's favor, as the Court must, the record contains sufficient evidence to survive summary judgment on the issue of whether Dr. Haig reasonably and detrimentally relied on Dr. Rothstein's alleged promise of employment.

### 3.   Whether injustice may be avoided only by enforcement of the promise is a fact-specific inquiry best left for the jury.

The final factor the plaintiff must show to prevail on a promissory estoppel claim is that "injustice can be avoided only by enforcement of the promise."  *Pettersen*, 2021 VT 16, at ¶ 11, 256 A.3d at 609.  This issue is a question of law, to be considered in the context of the following factors:

> (a) the availability and adequacy of other remedies, particularly cancellation and restitution; (b) the definite and substantial character of the action or forbearance in relation to the remedy sought; (c) the extent to which the action or forbearance

corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence; (d) the reasonableness of the action or forbearance; [and] (e) the extent to which the action or forbearance was foreseeable by the promisor.

*Tour Costa Rica*, 171 Vt. at 123, 758 A.2d at 801–02 (alteration in original) (quoting Restatement (Second) of Contracts § 139(2) (1981)). The "injustice" factor ultimately is a question of law, but "it necessarily 'depend[s] upon the circumstances of the case.'" *Boule*, 2013 WL 711937, at *13 (quoting *Tour Costa Rica*, 171 Vt. at 123, 758 A.2d at 802). Those circumstances are in dispute in this case and may not be decided on summary judgment.

In sum, there are genuine disputes of material fact regarding whether (a) Dr. Rothstein made a promise to Dr. Haig that Dr. Rothstein should have reasonably expected to induce action or forbearance, (b) Dr. Haig relied on that promise to his detriment, and (c) injustice may be avoided only by enforcement of the promise.

Therefore, the Court denies summary judgment as to the promissory estoppel claim.

## V.    Negligent Misrepresentation

Dartmouth asserts that summary judgment is appropriate on Dr. Haig's negligent misrepresentation claim because: (a) Dr. Haig did not believe that Dr. Rothstein had represented that his future employment at Dartmouth was a *fait accompli* as of February 2019; (b) a promise of future employment cannot be the basis for a negligent misrepresentation claim; (c) Dr. Rothstein did not owe Dr. Haig a duty to advise him of potential "institutional resistance" towards PM&R or towards Dr. Haig generally, and in any event, Dr. Haig was already aware of that resistance based on his employment discussions with Dartmouth on previous occasions; (d) even if a representation was made, Dr. Haig cannot show either that he was ignorant of its falsity or that he reasonably relied on the representation; and (e) by his own account, Dr. Haig

was unwilling to rely, and did not rely, on any promise or representation regarding prospective

employment with Dartmouth.[10]

Dr. Haig responds that facts material to his negligent misrepresentation claim remain in

dispute, as he has presented evidence demonstrating that Dr. Rothstein represented to Dr. Haig

that he "had been hired to fill the [OEM] [s]ection [c]hief position when [Dr. Rothstein] knew or

should have known that institutional resistance could still derail the process."  (Doc. 55 at 28.)

According to Dr. Haig, Dr. Rothstein knew or should have known that Dr. Haig would rely to his

detriment on Dr. Rothstein's representation, yet Dr. Rothstein allowed Dr. Haig to believe that

his employment was a "done deal, even when senior leaders [at Dartmouth] had exerted pressure

to back off on the promise to hire Dr. Haig."  (*Id.*)  As a result, Dr. Haig contends he incurred

fees, lost substantial time with his family and businesses, lost goodwill, and suffered adverse

effects on his reputation in the medical community.

Vermont has adopted the definition of negligent misrepresentation contained in the

Restatement (Second) of Torts § 552(1):

> One who, in the course of his business, profession or employment, or in any other
> transaction in which he has a pecuniary interest, supplies false information for the
> guidance of others in their business transactions, is subject to liability for pecuniary
> loss caused to them by their justifiable reliance upon the information, if he fails to
> exercise reasonable care or competence in obtaining or communicating the
> information.

*Howard v. Usiak*, 172 Vt. 227, 230–31, 775 A.2d 909, 913 (2001) (quoting *Limoge v. People's*

*Tr. Co.*, 168 Vt. 265, 268–69, 719 A.2d 888, 890 (1998)); *see Hunt Constr. Grp., Inc. v. Brennan*

*Beer Gorman/Architects, P.C.*, 607 F.3d 10, 17 (2d Cir. 2010) (noting that "[t]he Vermont court

---

[10]  The economic-loss doctrine generally prohibits recovery in tort for purely economic losses arising out of a contractual relationship.  *See Walsh v. Cluba*, 198 Vt. 453, 466 (2015) ("The economic-loss rule maintain[s] a distinction between contract and tort law by prohibit[ing] recovery in tort for purely economic losses.") (internal quotation marks and citation omitted).  For purposes of summary judgment, Dartmouth "assumes that Dr. Haig's claim is not barred by the economic-loss doctrine."  (Doc. 50-1 at 22 n.1.)

has repeatedly applied [the Restatement (Second) of Torts § 552(1)] in negligent

misrepresentation cases"); *Woodnotch Farms, Inc.*, 2021 WL 1387112, at *5.  Whether a

defendant exercised "reasonable care or competence" in communicating the alleged

misrepresentation depends on the circumstances and therefore is generally a question for the

factfinder.  *Howard*, 172 Vt. at 231, 775 A.2d at 913.  An objective standard applies in the

assessment of a plaintiff's "justifiable reliance upon the information" provided by the alleged

tortfeasor.  A plaintiff may justifiably rely on a representation "when the representation is not

obviously false and the truth of the representation is not within the knowledge of, or known by

the plaintiff[]." *Limoge*, 168 Vt. at 269, 719 A.2d at 890 (internal quotation marks omitted).  "In

evaluating whether a party's reliance is reasonable, the entire context of the transaction is

considered[,] including factors such as its complexity and magnitude, the sophistication of the

parties, and the content of any agreements between them." *McLaughlin*, 2021 WL 535873,

at *15 (internal quotation marks omitted) (finding that plaintiff's reliance on defendant attorney's

"verbal interpretation of a yet-to-be drafted written agreement" was not objectively reasonable).

   "The Vermont Supreme Court has 'emphasized . . . the need to keep tort and contract

theories separate so that negligence concepts do not overrun the limitations on contractual rights

and remedies[.]'" *Id.* at *14 (quoting *Howard*, 172 Vt. at 232, 775 A.2d at 913).  The court has

thus held that the "false information" required to support a claim for negligent misrepresentation

"does not normally include the intention to perform a contractual commitment." *Howard*, 172

Vt. at 232, 775 A.2d at 914.  Rather, the information must relate to "the *existence of facts*." *RSD*

*Leasing, Inc. v. Navistar Int'l Corp.*, Case No. 5:15-cv-205, 2021 WL 6802996, at *6 (D. Vt.

Mar. 12, 2021) (internal quotation marks omitted).  "In other words, a plaintiff cannot 'turn[] a

promise to perform into a statement of fact so that failure to perform automatically shows a

misrepresentation of intention to perform.'" *McLaughlin*, 2021 WL 535873, at *14 (quoting

*Howard*, 172 Vt. at 231–32, 775 A.2d at 913). "Statements of opinion generally cannot form the

basis of negligent-misrepresentation claims." *RSD Leasing, Inc.*, 2021 WL 6802996, at *6; *see*

*McLaughlin*, 2021 WL 535873, at *15 (finding that attorney did not misrepresent a past or

present fact, where he merely "provided his interpretation of an agreement that had not yet been

drafted"). Unless the statement is "so plainly of the one class or the other," it is generally a

question for the jury whether a statement is one of fact or opinion. *RSD Leasing, Inc.*, 2021 WL

6802996, at *6 (internal quotation marks omitted).

   The Vermont Supreme Court has held that a negligent misrepresentation claim may be

based on the fact that before the plaintiff was hired, the defendant knew there was a good chance

the plaintiff's job would be eliminated but failed to disclose that information to the plaintiff,

despite the plaintiff's expressed concerns regarding job security. Quoting the Restatement

(Second) of Torts § 551, the court found that the defendant owed a duty to disclose certain

information to the plaintiff prior to their consummation of an employment agreement:

> Contrary to defendant's contention, defendant owed a duty of care to plaintiff . . . .
> A party to a business transaction has a duty to exercise reasonable care to disclose
> to the other party the following information before the transaction is consummated:
>
> > (b) matters known to him that he knows to be necessary to prevent
> > his partial or ambiguous statement of the facts from being
> > misleading; and
> >
> > (c) subsequently acquired information that he knows will make
> > untrue or misleading a previous representation that when made was
> > true or believed to be so; and
> >
> > . . . .
> >
> > (e) facts basic to the transaction, if he knows that the other is about
> > to enter into it under a mistake as to them, and that the other, because
> > of the relationship between them, the customs of the trade or other

>     objective circumstances, would reasonably expect a disclosure of
>     those facts.

*Pearson v. Simmonds Precision Prods, Inc.*, 160 Vt. 168, 170–71 (1993) (second omission in original).

Although *Pearson's* facts are distinguishable from the facts in this case, the case nevertheless explains that "[u]nder certain circumstances, a party to a business transaction owes a duty to the other party to exercise reasonable care to disclose a matter in question." *Howard Opera House Assocs. v. Urb. Outfitters, Inc.*, 166 F. Supp. 2d 917, 929 (D. Vt. 2001) (citing *Pearson*, 160 Vt. at 170–71, 624 A.2d at 1136), *aff'd*, 322 F.3d 125 (2d Cir. 2003); *see Morton v. Allstate Ins. Co.*, 58 F. Supp. 2d 325, 329 (D. Vt. 1999) ("An employer may owe an employee entering into a business transaction with it a duty of care to disclose matters which are known to the employer and necessary to prevent its partial or ambiguous statements from being misleading, as well as facts about which the employee is mistaken, if the employee would reasonably expect disclosure."); *Griesi*, 360 Md. at 15, 756 A.2d at 555 ("[A]n employer may be obligated to exercise reasonable care in making representations to a prospective employee during pre-employment negotiations."); *Ruffalo v. CUC Int'l, Inc.*, 989 F. Supp. 430, 434 (D. Conn. 1997) ("[A]n innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth." (internal quotation marks omitted)).  As one court has explained, the tort of negligent misrepresentation recognizes the stakes inherent in pre-contractual employment negotiations:

>     [L]ike a contract for the sale of goods, the employer-employee relationship is a
>     business transaction, where a special relationship may develop giving rise to a duty
>     to exercise reasonable care in facilitating the transaction.  Depending on the market,
>     it is usually the future employer's objective to "sell" the prospective employee,
>     prior to the formation of an employment relationship, on the benefits and wisdom
>     of working for the employer. . . .  [P]re-contractual employment negotiations
>     manifestly require the employer to impart, and the prospective employee to digest,

> relevant and accurate information concerning the place of employment and the position to be occupied by the employee.  A prospective employee has a great stake in obtaining accurate information from his or her potential future employer and an employer reasonably should foresee that negligent misrepresentation of employment information may result in economic harm to the prospective employee.

*Griesi*, 360 Md. at 15–16, 756 A.2d at 555–56 (citation omitted).

Dartmouth contends that "a promise of future employment cannot be the basis for a negligent misrepresentation claim."  (Doc. 50-1 at 23) (citing *Pettersen*, 2021 VT 16, at ¶ 20, 256 A.2d at 611).  Consistent with that principle, the Second Circuit has held that the misrepresentation supporting a negligent misrepresentation claim "must be factual in nature and not promissory or relating to future events that might never come to fruition."  *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20–21 (2d Cir. 2000); *see Ruffalo*, 989 F. Supp. at 435 (stating that a claim for negligent misrepresentation requires that the information have been false at the time it was given, not simply that the decision maker changed his mind).  Dartmouth cites *Yellovich v. Ahold USA*, Civil Action No. 14-4665, 2014 WL 6676494, at *3 (E.D. Pa. Nov. 24, 2014) for the principle that a negligent misrepresentation claim may not be premised on "an allegation that a defendant eventually failed to complete a promise."  But as another case from the Eastern District of Pennsylvania clarified, although "[a] promise or representation made by an employer regarding future conduct is not generally actionable," courts have "refused summary judgment when the representation is made based on some kind of specialized knowledge or present fact."  *Chand v. Merck & Co.*, CIVIL ACTION No. CV 19-0286, 2020 WL 1987269, at *5 (E.D. Pa. Apr. 27, 2020); *see Mart v. Forest River, Inc.*, 854 F. Supp. 2d 577, 597 (N.D. Ind. 2012) (negligent misrepresentation claim survived motion to dismiss where plaintiff alleged he relied on representations by his employer's employee that plaintiff had a specific job with defendant company and he moved his family from Illinois to Indiana in reliance

on that representation).[11]  Moreover, the Vermont Supreme Court has held that "[t]he question of whether a statement is one of fact or opinion is for the jury to determine." *Silva*, 156 Vt. at 102 n.1, 589 A.2d at 857 n.1.

When Dr. Haig emailed Dr. Rothstein on April 23 inquiring if the contract would be complete by the end of the month, Dr. Rothstein replied on the same date: "That is the plan[,]" and "[w]e should have the paperwork for you shortly [after the end of the week]."  (Doc. 50-22 at 1.)  Dr. Haig responded, "Delighted!!! I'm so eager to get my sleeves rolled up and help." (*Id.*)  No evidence has been presented to the Court indicating that Dr. Rothstein clarified—in response to Dr. Haig's "Delighted!!!" email or any other similar communications from Dr. Haig—that there was uncertainty about whether Dartmouth would employ Dr. Haig as OEM section chief.  Yet this uncertainty existed, as reflected in several of Dr. Rothstein's emails to Dartmouth faculty.

For example, on April 4—a little over two weeks before the above-described email exchange between Dr. Rothstein and Dr. Haig—Dr. Rothstein stated in an email to another Dartmouth physician that "'[the deal with Dr. Haig] ain't over til it's over.'"  (Doc. 50-14 at 1.) And when Dr. Haig emailed Dr. Rothstein on May 1 asking if it would be "OK to tell patients that [he had] been invited to be chair of Occupational and Rehabilitation Medicine" at Dartmouth, Dr. Rothstein did not advise Dr. Haig not to do so.  (Doc. 50-25 at 1.)  Instead, Dr. Rothstein responded, "I'm meeting with Ed Merrens tomorrow[, and] [w]ill get back with you after."  (*Id.*)  Additionally, when Dr. Rothstein asked Dr. Haig on May 6 to return to Dartmouth for a third round of interviews, Dr. Rothstein told Dr. Haig the interviews were "just

---

[11]  *Yellovich* recognized that "Pennsylvania law is not perfectly settled on th[e] [issue of whether to] . . . allow claims for negligent misrepresentation . . . based on false promises of future conduct."  *Yellovich*, 2014 WL 6676494, at *3.

a question of office politics."  According to Dr. Haig, after those May 13 interviews,

Dr. Rothstein "assured [Dr. Haig] that he anticipated no problems" with their employment

agreement.  (Doc. 55-2 at 16, ¶ 34.)  By May 1, however, Dr. Rothstein appears to have been

aware of both Dr. Haig's internet self-review and negative feedback from Dartmouth faculty

about the possibility of Dr. Haig becoming OEM section chief.  In fact, less than a week before

he responded to Dr. Haig's email asking if he could advise his patients of the OEM section chief

position, Dr. Rothstein had voiced his apprehension about hiring Dr. Haig in an email to

Dr. Merrens, stating, "I think we need more discussion amongst ourselves and then an honest

dialogue with [Dr. Haig] about our concerns."  (Doc. 50-24 at 1; *see* Doc. 55-38 at 3:14–15

(Dr. Rothstein stating in deposition that he was "committed to [hiring Dr. Haig] until April 20

something[,] when additional information came to light").)

 Viewing the facts in Dr. Haig's favor, a reasonable factfinder could conclude that these

facts, coupled with the other facts detailed above, demonstrate that a material representation was

made to Dr. Haig regarding his potential employment with Dartmouth to support a claim of

negligent misrepresentation.  *See Chand*, 2020 WL 1987269, at *6 (denying summary judgment

where "reasonable factfinder could determine that representatives of [the defendant company]

impliedly communicated that [the plaintiff] was eligible for [a particular] position despite being

an F-1 visa recipient"); *Griesi*, 360 Md. at 17, 756 A.2d at 556 ("We weigh heavily in our

analysis that [defendant] had exclusive control of vital and material information necessary for

[plaintiff] fully to understand the situation, and that it never disclosed such information to

[plaintiff]."); *Morton*, 58 F. Supp. 2d at 329 (denying summary judgment where material facts

remained in dispute regarding "whether [the defendant] failed to exercise reasonable care or

competence in communicating information" to the plaintiff about new employee incentive

program); *Browne v. Maxfield*, 663 F. Supp. 1193, 1202 (E.D. Pa. 1987) (noting that prospective employer's statement to plaintiff that he could resign his present position because he would be given new position with employer would not be actionable if it were "merely a prediction that [plaintiff] would get the job" or an assertion of prospective employer's "present intentions" to hire plaintiff, but statement would be actionable if prospective employer "purport[ed] to have special knowledge of facts which would justify the expectations he [was] raising or if [prospective employer's] statement was a statement of present fact" (second and third alterations in original) (citation and internal quotation marks omitted)).

Dartmouth asserts that, even if Dr. Haig can demonstrate a "representation" sufficient to make a claim for negligent misrepresentation, he cannot show his ignorance of its falsity or that he reasonably relied on the alleged misrepresentation. (Doc. 50-1 at 24.) However, the record evidence indicates that this is an issue of fact. Although Dr. Haig was aware that some Dartmouth faculty were opposed in the past to hiring PM&R physicians in general and Dr. Haig in particular (*see, e.g.*, Doc. 50-4 at 3; Doc. 55-1 at 2, ¶ 5), he was unaware—based in part on Dr. Rothstein's representations to the contrary—of the specific negative response to his candidacy for the OEM section chief position. This negative response appears to have surfaced about two months after Dr. Haig and Dr. Rothstein's February 11, 2019 meeting. (*See, e.g.*, Doc. 50-23 at 3; Doc. 50-24 at 1; Doc. 50-26 at 1.) The record reveals that Dr. Rothstein considered having an "honest dialogue with [Dr. Haig] about [Dartmouth's] concerns" in late April 2019 (Doc. 50-24 at 1), but it does not appear that such a dialogue happened prior to May 17 when Dr. Rothstein informed Dr. Haig that Dartmouth was no longer pursuing the possibility of employing him as OEM section chief. According to Dr. Haig, Dr. Rothstein told him only that

"hospital politics" were delaying the process and necessitating Dr. Haig's return to Dartmouth for a third round of interviews in mid-May.  (*See* Doc. 55-2 at 16, ¶ 34.)

Furthermore, as discussed above, there are genuine factual disputes regarding whether Dr. Haig reasonably relied to his detriment on Dr. Rothstein's representations.  (*See* Doc. 55-1 at 3, ¶ 12a; 14, ¶ 59a; 15, ¶¶ 61b–c; 17, ¶ 70; 19–20, ¶¶ 82c–d, 83a; *see also* Doc. 50-16 at 1–2; Doc. 50-22 at 1; Doc. 55-25 at 2; Doc. 55-26 at 2; Doc. 55-33 at 2.)  It is for the jury to decide whether, considering the entire context of the dealings between Dr. Haig and Dr. Rothstein, Dr. Haig took action in reasonable reliance on the representations, or whether such action might have been avoided had Dr. Rothstein advised Dr. Haig earlier than May 17 that his employment with Dartmouth was uncertain.

Accordingly, the Court finds that there are disputed issues of fact relevant to Dr. Haig's negligent misrepresentation claim, and therefore denies summary judgment on this claim.

### Conclusion

For these reasons, the Court GRANTS Dartmouth's Motion for Summary Judgment (Doc. 50) with respect to Dr. Haig's breach of contract claim and DENIES the Motion with respect to Dr. Haig's promissory estoppel and negligent misrepresentation claims.

Dated at Burlington, in the District of Vermont, this 31st day of January 2023.

*/s/ Kevin J. Doyle*
Kevin J. Doyle
United States Magistrate Judge